**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
    vs.                            )          No. 08-20013-2-CM-JPO
                                   )
LEMARK D. ROBERSON,                )
                                   )
            Defendant.             )

## PLEA AGREEMENT

The United States of America, by and through Assistant United States Attorney, Tristram W. Hunt, and Lemark D. Roberson, the defendant, personally and by and through defendant's counsel, Jessica J. Travis, hereby enter into the following plea agreement pursuant to Rule 11 of the Federal Rules of Criminal Procedure:

    **1.**    **Defendant's Guilty Plea.**    The defendant agrees to plead guilty to Count 1 of the Third Superseding Indictment, to wit: conspiracy to knowingly and intentionally possess with intent to distribute and distribute 50 grams or more of a mixture or substance containing a detectable amount of cocaine base "crack cocaine," a controlled substance, within 1000 feet of the real property comprising a public secondary school, to-wit: Topeka High School, 800 West 10th Street, Topeka, Kansas, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(iii), 846 860(a) and Title 18, United States Code, Section 2. By entering into this plea agreement, the defendant admits to knowingly committing this offense, and to being guilty of the offense. The defendant understands that the maximum sentence which may be imposed as to Count 1 of the Third Superseding Indictment to which the

defendant has agreed to plead guilty is not less than 10 years, not more than life

imprisonment, not more than a $8,000,000 fine, not less than 5, not more than 10 years

of supervised release, and a $100 mandatory special assessment fee.  If the defendant

has a prior drug felony conviction, then the penalties are not less than 20 years, not

more than life imprisonment, not more than a $8,000,000 fine, not less than 10 years of

supervised release, and a $100 mandatory special assessment fee.  If the defendant

has a two prior drug felonies, then the sentence which must be imposed as to Count 1

of the Third Superseding Indictment to which the defendant has agreed to plead guilty

is life in prison without release, an $8,000,000 fine and a $100 mandatory special

assessment.  The Defendant further consents to the entry of a money judgment against

him in the amount of $30,515.00.  Defendant acknowledges and agrees that this

$30,515.00 figure represents proceeds obtained as a result of the conduct charged in

Count 1 of the Third Superseding Indictment.  In return for the defendant's plea of guilty

to Count 1 of the Third Superseding Indictment, the government agrees to dismiss the

remaining counts of the Third Superseding Indictment at sentencing.

      **2.**    **Factual Basis for the Guilty Plea.**    The parties agree the facts

constituting the offense to which the defendant is pleading guilty are as follows:

1.      Between September 15, 2007, and January 16, 2008, Cecil A. Brooks (hereinafter Brooks) maintained a residence located at 1942 North 24th Street, Kansas City, Kansas, which is located within 1000 feet of real property comprising a public elementary school, to-wit: New Chelsea Elementary School, 2500 Wood, Kansas City, Kansas, for the purpose of storing, manufacturing and distributing cocaine and cocaine base "crack cocaine."

2.      Cocaine base "crack cocaine" that was manufactured or stored at 1942 North 24th Street, Kansas City, Kansas, was transported to various apartments in the Winstone Apartment Complex located at 800 SW Polk, Topeka, where the cocaine base "crack cocaine" was stored and then distributed from, by Brooks,

Lemark D. Roberson (hereinafter Roberson), Luis Rivera-Cotto (hereinafter Rivera-Cotto), Adam G. Newton (hereinafter Newton) , and other indicted and unindicted co-conspirators.  More than 50 grams of cocaine base "crack cocaine" was distributed during the course of the charged conspiracy and more than $30,515 in drug proceeds were derived during the course of the charged conspiracy.

3.    Cash drug proceeds were collected in Topeka by Brooks and Roberson with most of the proceeds being returned to various locations in the Kansas City metropolitan area.

4.    On November 23, 2007, in an apartment at the Winstone Apartment Complex, 800 SW Polk in Topeka, Brooks accused Newton of being responsible for either stealing or losing $1000 worth of cocaine base that belonged to Brooks.  Brooks struck Newton on the side of his head with a bottle thereby knocking him to the ground.  Once Newton was on the ground, Brooks picked up a hot clothes iron and burned Newton on the back with the iron several times.  Brooks hit Newton with a bottle and then burned him with an iron to punish Newton and in order to convey to any other person(s) who heard about the attack that it was dangerous to steal cocaine base.

Newton's First Statement to Police

5.    On November 23, 2007 at approximately 0440 hours, Topeka Police Officer McEntire was dispatched to Walgreens located at 1001 SW Topeka in reference to a drug complaint.  Officer McEntire arrived and was greeted by a white male standing in front of the business.  He identified himself as Adam G. Newton. Newton told Officer McEntire that he had information about a major narcotic operation in Topeka and Kansas City, Kansas.  Officer McEntire asked him how he got this intelligence and he stated that he was a part of it.

Newton told Officer McEntire he wanted to tell police every aspect of the operation but had to leave the area immediately.  Officer McEntire told Newton to get in the back seat and we would go to the Law Enforcement Center (LEC). Newton got in to Officer McEntire's car and he notified dispatch that he was transporting a male to the LEC.  Once at the LEC, he escorted Newton to an interview room.  Officer McEntire received Newton's Kansas Drivers License and turned the recording system on.

Once Officer McEntire had returned to the interview room he asked Newton to tell him what was going on.  Newton said that mass amounts of crack cocaine were being sold at 800 SW Polk in Topeka, Kansas.  Newton said that the narcotics were being manufactured in Kansas City and brought to Topeka for distribution.  Officer McEntire asked Newton why he was reporting this to police if

3

he was part of the operation.  Newton said he was reporting the drug operation because he was now scared for his safety.

Newton explained that he had been selling crack cocaine for an individual by the name of Cecil Brooks for approximately five months.  Newton stated that he was responsible for transporting the drugs with Cecil from Kansas City to Topeka. Newton said that once the drugs were in Topeka, he sold them on the streets. Newton went on to say that on November 23, 2007 he arrived back at 800 SW Polk , apartment #38 to have a meeting with Cecil.  Newton said that when he arrived at the apartment another employee of Cecil's by the name of "Kenny" was already present.

Newton said that Kenny and he starting speaking with each other when Cecil arrived in the apartment.  Newton said that Cecil was drinking a bottle of beer and carrying another unopened bottle.  Newton said that once Cecil had closed the door both he and Kenny stood up to greet him.  Newton said  that Cecil put down the open bottle of beer and the struck Kenny in the head with the unopened bottle.  Newton said that Kenny dropped to the ground immediately. Newton stated that when Kenny fell to the ground, Cecil raised the bottle back up and struck Newton on the left side of the head causing the bottle to break.  It should be noted that upon meeting Newton, Officer McEntire saw a large laceration on the left side of his head that was approximately three inches long. Newton continued and stated that he also fell to the ground.  Newton stated that once on the ground, Cecil picked up a clothes iron that had previously been turned on and lifted up Newton's shirt.  Newton stated that Cecil then placed the iron on his back causing a severe burn.  Newton then stood up and showed Officer McEntire his back.  Officer McEntire noted that Newton had a bad burn to his back in the shape of an iron.  Newton had burnt dead skin hanging from his back.

Officer McEntire stopped Newton and asked him if he needed medical attention. Newton said he was okay and would seek treatment later.  Officer McEntire asked him why this even had occurred.  Newton said that one thousand dollars worth of cocaine had been stolen the day before.

Newton said that Cecil probably knew that he and Kenny had nothing to do with the narcotics disappearing but had to take his anger out on somebody.  Newton said that the drugs had disappeared from apartment #38 while an individual by the name of Lemark Roberson was selling them.  Newton stated that Lemark is a long term friend with Cecil and Cecil would do nothing to harm him.

After Officer McEntire heard the story about what had occurred, he asked Newton to explain the drug operation.  Newton explained that it all started at one of Cecil's addresses.  Newton stated that the address was 1942 N. 24th in Kansas City, Kansas.  Newton said that is where he also stayed and does not

4

come to Topeka until it is time to take a shipment. Newton stated that Cecil comes over to the house and already has the powder cocaine. Newton stated that Cecil then makes the cocaine in to crack. Newton said Cecil then cut the product for individual sale. Newton stated that once the product was cut and packaged it was distributed in Kansas City as well as Topeka.

Newton stated that when it was time to take a shipment of narcotics to Topeka, Cecil would call him via telephone the day of transport and tell him that he would pick him up at 1942 N. 24th at an unknown time and not to leave the house. Newton explained that sometime that day, Cecil would arrive in his newer model Silver or gun metal grey Chevy Tahoe. Cecil would go into the residence and make Newton hide all of the narcotics on his person. Newton said that he usually hid the crack in his waistband pockets and shoes. Newton said that usually when they transported to Topeka there were five thousand dollars worth of cocaine. Newton said that once he had all the drugs hidden, Cecil drove him to 800 SW Polk in Topeka.

Newton explained that when they arrived at apartment #38; they were met by Lemark Roberson and an Unindicted Co-conspirator (UCC#4). Newton stated that these two people were responsible for selling the narcotics from the apartment. Newton stated that he would take all of the cocaine off his person and gave it back to Cecil. Cecil then verified that the entire product was accounted for. Newton said that once the transportation was done, Cecil gave Newton his cut to sell on the street and the rest stayed in apartment #38 for sale.

Officer McEntire asked Newton what he could tell him about the sales from the apartment. Newton stated that Lemark and UCC#4 were the only two people that sold from that apartment. Newton stated that once they reached a certain level of sales, UCC#4 would take the cash to apartment #35. Newton told Officer McEntire that an elderly gentleman lived there who allowed them to use his apartment to store the profits and cocaine. Newton said that after Lemark and UCC#4 were done with sales for the day, UCC#4 also took the cocaine and money and hid it in apartment #38 until the next business day. Officer McEntire asked Newton if any weapons were kept by any party involved. Newton said that Lemark and UCC#4 possessed .45 caliber and 9mm pistols. Newton said that they were not always in possession of the handguns though and they are most generally stored in apartment #38. Newton said that the only time they have the guns is when they think they might be raided by rival dealers.

Officer McEntire asked Newton who else in Topeka was involved in the operation. Newton said that there were also two Puerto Ricans that lived in the building that acted as counter surveillance from the police. Newton said that once the Porto Ricans spotted any sign of trouble, they notify apartment #38 so the evidence would then be moved to apartment #35. Newton was asked if there was anyone else involved that he knew of. Newton said that occasionally Cecil's

5

relative, UCC#6 would come with Cecil and was also involved in drug sales in Kansas City.

Officer McEntire then asked Newton how sales could be conducted from the apartments with out the police or apartment management not being notified. Newton stated the reason was because Cecil was the co-owner of the apartment complex with UCC#7.  Newton said that UCC#5 was well aware of what was going on in the building but did not think that he was involved with the sales.

Officer McEntire felt that he had received all the information that he could and asked Newton what he wanted to do about the battery against.  Newton said he was too scared make a criminal report against Cecil.  Newton explained that Cecil had already warned him that if he "ever did him wrong;" he knew where Newton's mother and father lived.  Newton explained that he wanted police to help take apart the narcotics operation.  Officer McEntire asked him if he was willing to work with narcotics officers. Newton stated that he was.

Officer McEntire then called Cpl. J. Padilla and asked him to come to the LEC. Cpl. Padilla arrived a short time later.  Officer McEntire explained the situation to Cpl. Padilla and told him about Newton's desire to work with narcotic officers. Cpl Padilla told Officer McEntire  to file a report. Cpl. Padilla also took photographs to document Newton's injuries.  Officer McEntire  then expressed an interest to Cpl. Padilla about calling back a narcotics officer to speak with Newton immediately.  Cpl. Padilla stated he would call Officer Riggins and tell him about the situation.  Cpl Padilla left and came back a short time later and stated that Officer Riggins was en route to the LEC.

A short time later Officer Riggins arrived at the LEC.  Officer McEntire  briefed him of the information he had received from Newton.  Officer Riggins said he was going to interview Newton as well.  Officer McEntire pointed out what room Newton was in and then waited for the interview to be completed.  After the interview was completed, Officer Riggins said that Newton was free to leave. Officer McEntire  spoke to Newton again and asked him if he wanted a ride to the hospital for treatment of his injuries.  Newton said that he wanted to go to the hospital.  Newton was then transported to a local hospital emergency.

6.      The Topeka Police Department (TPD), the Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration (DEA) began a joint investigation of the Brooks Drug Trafficking Organization (BDTO).  Utilizing a confidential informant (CI), officers were able to make a number of purchases of "crack cocaine" from individuals at the Winstone Apartment Complex located at 800 SW Polk, Topeka, Kansas, which is within1000 feet of the real property comprising a public secondary school, to-wit: Topeka High School, 800 West 10th Street, Topeka, Kansas.

7.    On December 20, 2007, the CI purchased cocaine base "crack cocaine" from
      Cynthia Weixelman (hereinafter Weixelman) at the Winstone Apartment
      Complex located at 800 SW Polk, Topeka, Kansas.  Weixelman was seen by
      officers meeting with the CI.  The CI reported to officers that he/she had given
      Weixelman $20.00 for the "crack cocaine" and that Weixelman had then gone up
      to an apartment on the third floor.  The CI stated Weixelman then came back
      from the third floor with a rock of "crack cocaine" and gave it to him/her.  The CI
      was shown a picture of Weixelman and he/she positively identified her as the
      person who had sold him/her the "crack cocaine."  The quantity of drugs
      Weixelman sold to the CI were tested by a chemist at the Kansas Bureau of
      Investigation and were determined to be cocaine base "crack cocaine" with a net
      weight of .21 grams.

8.    On December 21, 2007, the CI purchased cocaine base "crack cocaine" from
      Gaylon Steele (hereinafter Steele) at the Winstone Apartment Complex located
      at 800 SW Polk, Topeka, Kansas.

9.    On January 3, 2008, 2007, the CI purchased cocaine base "crack cocaine" from
      Steele at the Winstone Apartment Complex located at 800 SW Polk, Topeka,
      Kansas.

10.    On January 16, 2008, the CI purchased cocaine base "crack cocaine" from the
      Luis Rivera-Cotto and Steele at the Winstone Apartment Complex located at 800
      SW Polk, Topeka, Kansas. The CI initially met with Steele who then took him to
      apartment #17.  Steele took the official funds and knocked on apartment #16
      and made contact with Rivera-Cotto.   Rivera-Cotto then took the official funds
      and went to apartment #38 and returned with the "crack cocaine" and gave it to
      the CI.  The CI noted that the he recognized Rivera-Cotto as being the same
      person who had sold him drugs at the Winstone Apartment Complex on
      December 19, 2007.  The quantity of drugs the Rivera-Cotto and Steele sold to
      the CI were tested by a chemist at the Kansas Bureau of Investigation and were
      determined to be cocaine base "crack cocaine" with a net weight of .3 grams.

11.    On January 16, 2008, a coordinated series of search warrants were served at
      several apartments at the Winstone Apartment Complex located at 800 SW
      Polk, Topeka, Kansas.  Cocaine base "crack cocaine," a firearm and drug
      paraphernalia were recovered during the execution of these warrants.  Eight
      individually wrapped rocks of crack cocaine was recovered from inside
      apartment #16, the apartment Rivera-Cotto was living in.  Rivera-Cotto showed
      officers where the crack was located in the apartment. Drug paraphernalia was
      also seized as was at $20 bill (No. EJ50352072A) that had been used by the CI
      to make the purchase from Rivera-Cotto and Steele earlier the same day.
      Rivera-Cotto was arrested along with several co-defendants, including Gaylon
      Steele.  The quantity of crack cocaine the Rivera-Cotto possessed in the

7

apartment was tested by a chemist at the Kansas Bureau of Investigation and were determined to be cocaine base "crack cocaine" with a net weight of 2.09 grams.

Rivera-Cotto's Statement to Police

12.  After his arrest, officers interviewed Rivera-Cotto. Rivera-Cotto was read a Miranda warning. Rivera-Cotto stated that he understood his rights and would be willing to speak to officers without an attorney present. Rivera-Cotto stated that his cousin, UCC, lives in apartment #16 and he hangs out with his cousin. Rivera-Cotto stated that he has only hung around UCC's apartment for about two weeks. During this time, Rivera-Cotto said he has seen UCC make approximately 100 crack cocaine sales. Rivera-Cotto said that the majority of the crack cocaine sales were of $20 pieces of crack cocaine. Rivera-Cotto said that the crack cocaine user would usually knock on the outside of the window and UCC would go let the user in the door. UCC would bring the user back to apartment 16 where the crack cocaine sales were made. Officers asked Rivera-Cotto how many times he had sold crack cocaine and Rivera-Cotto initially said that he had only sold crack cocaine 2-3 times in the last two weeks. Officers challenged Rivera-Cotto on this story and Rivera-Cotto then told officers he had sold crack cocaine approximately 50 times the past couple of weeks. Rivera-Cotto stated that he made 2-3 crack cocaine sales on January 16, 2008. Officers asked Rivera-Cotto where he got the crack cocaine from. Rivera-Cotto stated he was afraid to tell officers who the supplier was because he feared that if he told them, that the supplier would kill him and/or his family. Rivera-Cotto ultimately told officers that the supplier of the crack cocaine was "Cecil" (Brooks) from Kansas City who drives a Jeep-type vehicle. Rivera-Cotto said that "Cecil" would "front" about $1,000 worth of crack cocaine at a time to UCC. Rivera-Cotto stated the he knew that "Cecil" was also supplying Mark (co-defendant Roberson) in apartment #38 with crack cocaine. Rivera-Cotto stated that Mark is know as "Blue."

Cynthia Weixelman's Statement to Police

13.  An officer read Weixelman her *Miranda* warning from a TPD *Miranda* card. Weixelman stated that she understood her rights and would be willing to speak to the officer. Weixelman stated that she was a "crack cocaine" user. Weixelman said that she had purchased "crack cocaine" from Mark (Roberson) in apartment #38, Winstone Apartment Complex, approximately 7-10 times over the preceding 5 months. Weixelman said that she usually purchased $20 "crack cocaine" rocks from Mark but had also purchased some $50 pieces from him. Defendant stated that she had purchased "crack cocaine" from Galen (Steele) in apartment #17, approximately 30 times over the preceding 6 months. Weixelman said that she usually purchased $20 "crack cocaine" rocks from Galen (Steele) but had also purchased some $50 pieces from him. Weixelman

8

stated that she had purchased "crack cocaine" from the "Puerto Rican brothers" in apartment #16.   Weixelman stated that the "Puerto Rican brothers" are Luis (Rivera-Cotto) and an unindicted co-conspirator (UCC).  Weixelman said that she had purchased from the UCC an additional 6-7 times.  Weixelman stated that she usually purchased $20 "crack cocaine" rocks from Luis and the UCC. Weixelman recounted that she first began purchasing crack cocaine approximately 6 months prior to her arrest from UCC#2  who used to be in apartment #17.  The officer asked the Weixelman who the supplier was to the people who she said she bought crack cocaine from.  Weixelman asked if anyone could hear her speaking.  Weixelman stated that "they" would kill her if they found out she was talking to the police.  Weixelman leaned forward over the table in the interview room and began speaking in a whisper.  Weixelman told the officer that UCC#3 is the supplier.  Weixelman stated that UCC#3 used to be the manager at the apartments.  Weixelman stated that UCC#3 had a silver truck, a silver Lexus, and two other silver cars.  Officers asked Weixelman how many times she had sold "crack cocaine."  Weixelman said that she is a user, not a dealer.  Officers asked Weixelman if she had ever helped anyone get "crack cocaine."  Weixelman said that she has helped two people get "crack cocaine" from both Mark and Galen (Steele).  Weixelman said that she would take the money from the user, go to Mark or Galen (Steele) and give them the money.  Weixelman would get "crack cocaine" for the money and then take the "crack cocaine" back to the user and give the "crack cocaine" to them. Weixelman said  that she has assisted in the purchased of "crack cocaine" approximately 4 times wherein she went to Mark for the "crack cocaine" and approximately 10 times where she went to Galen (Steele) for the "crack cocaine."

3.     **Application of the Sentencing Guidelines.**     The parties request that

the United States Sentencing Guidelines (Guidelines) be applied by the Court to

calculate the applicable sentence in this case and that a sentence consistent with the

Guidelines be imposed by the Court.   The defendant further waives any right to have

facts that determine the offense level under the Guidelines alleged in an Indictment and

found by a jury beyond a reasonable doubt; agrees that facts that determine the

offense level will be found by the Court at sentencing by a preponderance of the

evidence and agrees that the Court  may consider any reliable evidence, including

hearsay; and the defendant agrees to waive all constitutional challenges to the validity

9

of the Guidelines. The parties further agree to request a sentence within the guideline range determined to be appropriate by the U.S. District Court.  In other words, the United States will not request a sentence in excess of the high end of the guideline range and the defendant will not request a sentence below the low end of the guideline range. The parties understand this agreement binds the parties only and does not bind the Court.

4.    **Forfeiture of Assets**.    Defendant knowingly and voluntarily consents to entry of the money judgment in the amount of $30,515.00.  Defendant knowingly and voluntarily waives all constitutional, legal and equitable defenses to the entry of the money judgment in any proceeding.  Defendant further agrees that he will truthfully and accurately complete a financial disclosure form prior to signing this agreement and will list all his assets and financial interests.  Defendant freely, voluntarily, knowingly and intelligently waives any right to collaterally attack any matter in connection

5.    **Relevant Conduct**.    The parties have agreed to the application of the Guidelines and therefore both the United States and the defendant understand that the conduct charged in any dismissed counts of the indictment is to be considered as well as all other uncharged related criminal activity as relevant conduct for purposes of calculating the offense level for Count 1, in accordance with United States Sentencing Guidelines (U.S.S.G.) § 1B1.3.

6.    **Government's Agreements**.    In return for the defendant's plea of guilty as set forth herein, the United States Attorney for the District of Kansas agrees:

    a.    To not file any additional charges against the defendant arising out of the facts forming the basis for the present Third Superseding

10

Indictment;

b. To recommend a sentence at the low end of the applicable guideline range;

c. To recommend the defendant receive a two (2) level reduction in the applicable offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility.  In addition, if the defendant's offense level is 16 or greater, the United States will move at the time of sentencing for the defendant to receive an additional one (1) level reduction for acceptance of responsibility because the defendant timely notified the government of his intention to enter a plea of guilty.

d. To not seek enhancements pursuant to Title 21, United States Code, Section 851 based on the defendant's one (1) prior felony drug trafficking conviction, however, the decision not to file this enhancement will be taken into consideration when/if the government files a § 5K1.1 downward departure motion.

e. The government agrees to stand silent at sentencing as to whether the defendant should receive firearm enhancement pursuant U.S.S.G. § 2D.1.1(b)(1).

The government's obligation concerning its agreements listed in ¶ 6 are contingent upon the defendant's continuing manifestation of acceptance of responsibility as determined by the United States.  If the defendant denies or gives conflicting statements as to his involvement, falsely denies or frivolously contests relevant conduct that the court determines to be true, willfully obstructs or impedes the administration of justice as defined in U.S.S.G. § 3C1.1 (or willfully attempts to do so), or engages in additional criminal conduct, the United States reserves the right to withdraw all of its recommendations without breaching this agreement.

In the event the defendant breaches or violates this plea agreement or otherwise fails to adhere to its terms, the United States shall not be bound by this paragraph and may pursue any additional charges arising from the criminal activity under investigation

as well as any perjury, false statement, or obstruction of justice charges which may have occurred.  The defendant understands and agrees that in the event the defendant violates this plea agreement, all statements made by the defendant subsequent to the execution of this plea agreement, any testimony given by defendant before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against the defendant in any and all criminal proceedings.  The defendant waives any rights which might be asserted under the United States Constitution, any statute, Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, or any other federal rule that pertains to the admissibility of any statements made by the defendant subsequent to this plea agreement.

       7.      **Defendant's Agreements**.    The defendant agrees to cooperate fully and truthfully with the United States as follows:

       a.     Defendant agrees to provide truthful, complete, and accurate information and testimony in the trial of this matter, before any grand jury proceeding, or in any related hearing;

       b.     Defendant agrees to provide all information concerning the defendant's knowledge of, and participation in, the offenses charged in the indictment and all related conduct;

       c.     Defendant agrees that if the United States determines the defendant has not provided full and truthful cooperation, or has committed any local, state, or federal crime between the date of this plea agreement and his sentencing, or has otherwise violated any other provision of this plea agreement, [or has violated the terms and conditions of  his release while on bond as required by the Court,] the plea agreement may be voided and the defendant shall be subject to prosecution for any federal crime of which the United States has knowledge including, but not limited to, perjury, obstruction of justice, and any substantive offenses arising from this investigation.  Such prosecution may be based upon any information provided by the defendant during the course of the defendant's cooperation, or upon leads derived therefrom, and this

12

information may be used as evidence against the defendant.  In addition, the defendant's previously entered plea of guilty will remain in effect and cannot be withdrawn;

d.      Defendant agrees to fully and completely assist the United States in the identification and recovery of forfeitable assets, either domestic or foreign, which have been acquired directly or indirectly through the unlawful activities of the defendant, co-defendants, and/or co-conspirators and further agrees to not contest any forfeiture proceedings.

8.      **Substantial Assistance.**      The government notes that defendant has cooperated with the government.  However, defendant acknowledges that substantial assistance has not yet been provided by the defendant within the meaning of U.S.S.G. § 5K1.1 and Title 18, United States Code § 3553(e). The defendant also acknowledges and understands that the determination as to whether the defendant has provided substantial assistance and whether a motion pursuant to U.S.S.G. § 5K1.1 will be filed are left entirely and exclusively within the discretion of the United States.  If a determination is made by the United States the defendant has provided substantial assistance, the United States shall request that the Court consider reducing the sentence the defendant would otherwise receive under the applicable statutes and/or sentencing guidelines pursuant to Title 18, U.S.C. § 3553(e), Title 28, U.S.C. § 994(n), and U.S.S.G. § 5K1.1.

9.      **Sentence to be Determined by the Court.**      The defendant understands that the sentence to be imposed will be determined solely by the United States District Judge.  The United States cannot and has not made any promise or representation as to what sentence the defendant will receive.

13

10. **Information Provided by Defendant.** The United States agrees not to use new information the defendant provides about the defendant's own criminal conduct except as specifically authorized by U.S.S.G. § 1B1.8. As such, this information may be revealed to the Court but may not be used against the defendant in determining the defendant's applicable guideline range or departing above her guideline range. Defendant understands and agrees, however, that under U.S.S.G. § 1B1.8, there shall be no such restrictions on the use of the information: (1) previously known to the United States; (2) revealed to the United States by, or discoverable through, an independent source; (3) in a prosecution for perjury or giving a false statement; (4) in the event there is a breach of this agreement; or (5) in determining whether and to what extent a downward departure as a result of a government motion pursuant to Title 18, U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 is warranted.

11. **Identification of Assets.** The defendant agrees to disclose to law enforcement officials the existence and status of all monies, property or assets, of any kind, derived from or acquired as a result of, or used to facilitate the commission of the crimes charged. The defendant agrees to deliver to the United States of America, prior to sentencing, a completed financial statement identifying all of the defendant's assets. The defendant further agrees to prevent the disbursement of any monies, property or assets derived from the crimes charged. If the defendant fails to comply with this provision the United States is relieved of its obligation to recommend a sentencing reduction for Acceptance of Responsibility pursuant to § 3E1.1 or any other sentencing recommendations contained in this agreement.

14

12.   **Withdrawal of Plea Not Permitted.**   The defendant understands that if the court accepts this plea agreement but imposes a sentence with which the defendant does not agree, the defendant will not be permitted to withdraw this plea of guilty.

13.   **Payment of Special Assessment.**   The defendant understands that a mandatory special assessment of $100 per count of conviction will be entered against the defendant at the time of sentencing.  The defendant agrees to deliver to the clerk of the court payment in the appropriate amount no later than the day of plea.  If the defendant fails to make full payment of the special assessment the United States will no longer be bound by the provisions contained in Section 5(b) of this agreement.  The burden of establishing an inability to pay the required special assessment lies with the defendant.

14.   **Waiver of Appeal and Collateral Attack.**   Defendant knowingly and voluntarily waives any right to appeal or collaterally attack any matter in connection with this prosecution, conviction and sentence.  The defendant is aware that Title 18, U.S.C. § 3742 affords a defendant the right to appeal the conviction and sentence imposed. By entering into this agreement, the defendant knowingly waives any right to appeal a sentence imposed which is within the guideline range determined appropriate by the court.  The defendant also waives any right to challenge a sentence or otherwise attempt to modify or change her sentence or manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, U.S.C. § 2255 [except as limited by *United States v. Cockerham*, 237 F.3d 1179, 1187 (10th Cir. 2001)], a motion brought under Title 18, U.S.C. § 3582(c)(2) and a motion brought

15

under Fed. Rule of Civ. Pro 60(b).  In other words, the defendant waives the right to appeal the sentence imposed in this case except to the extent, if any, the court departs upwards from the applicable sentencing guideline range determined by the court. However, if the United States exercises its right to appeal the sentence imposed as authorized by Title 18, U.S.C. § 3742(b), the defendant is released from this waiver and may appeal the sentence received as authorized by Title 18, U.S.C. § 3742(a).

15.    **Waiver of FOIA Request.** The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, Title 5, U.S.C. § 552, or the Privacy Act of 1974, Title 5, U.S.C. § 552a.

16.    **Waiver of Claim for Attorney's Fees.**    The defendant waives all claims under the Hyde Amendment, Title 18, U.S.C. § 3006A, for attorneys fees and other litigation expenses arising out of the investigation or prosecution of this matter.

17.    **Full Disclosure by United States.**    The defendant understands the United States will provide to the court and the United States Probation Office all information it deems relevant to determining the appropriate sentence in this case.  This may include information concerning the background, character, and conduct of the defendant including the entirety of the defendant's criminal activities.  The defendant understands these disclosures are not limited to the count to which the defendant has pled guilty.  The United States may respond to comments made or positions taken by

16

the defendant or defendant's counsel and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement.  The defendant also has the right to provide information concerning the offense and to make recommendations to the court and the United States Probation Office.

18.    **Parties to the Agreement.**    The defendant understands this plea agreement binds only the defendant and the United States Attorney for the District of Kansas, and that it does not bind any other federal, state, or local prosecution authority.

19.    **No Other Agreements**.    The defendant has had sufficient time to discuss this case, the evidence, and this agreement with the defendant's attorney and defendant is fully satisfied with the advice and representation provided by defendant's counsel.  Further, the defendant acknowledges that he has read the plea agreement, understands it and agrees it is true and accurate and not the result of any threats, duress or coercion.  The defendant further understands that this plea agreement supersedes any and all other agreements or negotiations between the parties, and that this agreement embodies each and every term of the agreement between the parties. The defendant acknowledges that the defendant is entering into this agreement and is pleading guilty because the defendant is guilty and is doing so freely and voluntarily.

Tristram W. Hunt

2. 9. 09

17

Assistant U.S. Attorney KS. S.Ct. #18196
500 State Avenue, Suite 360
Kansas City, Kansas 66101
(913) 551-6730
 FAX: (913) 551-6541
Tris.Hunt@usdoj.gov


Scott Rask
Supervisor

Date: 2-9-09


Lemark D. Roberson
Defendant

Date: 2-9-09


Jessica J. Travis
Keck & Travis, LLC
130 N. Water Street
Olathe, KS, 66061
913-782-8200
Fax: 913-782-2283
E-mail: travislawkc@aol.com
Counsel for defendant Lemark D. Roberson

Date: 2-9-09

18